UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LASHONN WHITE,<br><br>               Plaintiff,<br><br>     v.<br><br>CITY OF TACOMA, RYAN KOSKOVICH, MICHAEL YOUNG, MICHAEL LIM, CAROL KRANCICH, PIERCE COUNTY, JOHN AND/OR JANE DOE, ANNE JACKSON, ANNE JACKSON,<br><br>               Defendant. | CASE NO. C12-5987 RBL<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT<br>(DKT # 46, #63, #79, & #87) |

THIS MATTER is before the Court on Defendants City of Tacoma, Ryan Koskovich, Michael Young, Michael Lim, and Carol Krancich's Motion for Summary Judgment (Dkt. #79), Defendants Pierce County and Anne Jackson's Motion for Summary Judgment (Dkt. #46), and Plaintiff LaShonn White's two Cross-Motions for Partial Summary Judgment (Dkt. #63 and Dkt. #87).

## I. BACKGROUND

White was born completely deaf and has never learned to speak. She can say single words, but it is difficult for others to understand her. She reads and writes at approximately a

fourth-grade level and can read lips in some situations. She communicates primarily in American Sign Language (ASL). White was also born with a bowel condition called "imperforate anus." Due to her condition, she has to follow a special diet and has trouble controlling her bowels.

Defendants Ryan Koskovich, Michael Young, and Carol Krancich are all police officers for the City of Tacoma. Michael Lim is a Sergeant for the City. Defendant Anne Jackson is a nurse at the Pierce County Jail.

On the evening of April 6, 2012, White used a video phone and a video relay service to call 911 from her home. She reported that Sophia Johnson, a guest of hers who is also deaf, was attacking her. Officers Koskovich and Young responded to her call and immediately made contact with Johnson, who had exited the building. When White ran outside to talk with the police, Koskovich thought that she was sprinting towards them to assault Johnson, Young, or himself, so he tased her. After tasing White, the officers attempted to determine what had happened in her apartment, but they were unable to communicate with White and Johnson. Officer Krancich, who knows a small amount of ASL, attempted to help with the investigation, but she, too, was unable to communicate with either of the parties.

At the end of the investigation, Koskovich, Young, and Sergeant Lim, who had responded to the scene because Koskovich had used his taser, decided to place White under arrest, charge her with assaulting Johnson and obstructing justice, and book her into the Pierce County Jail. Johnson was not charged with a crime.

White was taken to the Pierce County Jail where she was held for two days. While White was incarcerated at the jail, Nurse Jackson treated the superficial injuries that she sustained when

she was tased.  White was not provided an ASL interpreter at anytime during her incarceration, and she never attempted to tell anyone about her bowel condition.

White has sued the City of Tacoma and the officers who responded to her 911 call for violating her Fourth Amendment rights and for not providing her with an interpreter during the investigation.  She has sued Pierce County and Nurse Jackson for violating her Eighth Amendment rights and for not providing her with an ASL interpreter at specific times during her incarceration.  White's precise claims will be listed more fully below.

**A.    Events Leading up to White's Arrest From Her Perspective**

On the evening of April 6, 2012, Sophia Johnson visited White at her home.  For no apparent reason, Johnson became violent and started to choke and hit White.  White fought back and then used her specially-equipped video phone and a video relay service to call 911.  Through the ASL interpreter provided by the relay service, White told the 911 operator that she had been attacked and requested assistance.  White told the 911 operator Johnson's name, described what she was wearing, and told the operator that she had gone out the back of the building.

A few moments later, the 911 operator told White that police officers had arrived.  The operator asked White to go outside to talk with them; she complied.  She ran out the front doors to where the operator told her the officers would be waiting.  According to White, it was so dark outside that she could only see the shape of a police car in front of her.  As she was running, she waved her hand at where she assumed the officers were waiting to flag them down, and then she was tased.

After being tased, the officers provided White with a pen and paper, but she simply requested that the officers call an ASL interpreter.  White claims that she did not initially use gestures or pass notes back and forth to communicate with the police because she did not want to be misunderstood.  White later tried to communicate with Officer Krancich, but she quickly grew

1  frustrated with Krancich's inability to understand her and gave up. Throughout the investigation,

2  White was never provided with an ASL interpreter and was never able to tell the police her side

3  of the story. Nevertheless, the police charged her with assault and obstruction of justice and took

4  her to the Pierce County jail.

5      **B.      Events Leading up to White's Arrest From the Officers' Perspectives**

6          Koskovich and Young were dispatched to respond to a possible fight inside of an

7  apartment just after 11:30 p.m. On their way to the apartment, the dispatcher gave the officer's

8  the reporting party's description of "the person doing the hitting." The dispatcher did not

9  explicitly tell the officers that the caller was deaf. Koskovich and Young claim that they

10 believed that the person who had called 911 witnessed the altercation from a neighboring

11 apartment. Just before arriving, the officers asked the dispatcher to have the person who called

12 911, the reporting party, meet them outside in a couple of minutes. A few minutes later, the

13 dispatcher told the officers that she was still trying to get the interpreter to have the reporting

14 party step out the front door.

15         When the officers arrived at the apartment building, they parked their patrol car in front

16 of the front doors and turned on the overhead lights. They immediately saw a woman leaving

17 from the back of the building who matched the description of "the person doing the hitting" and

18 made contact with her. The officers informed dispatch that they were walking the woman back

19 to the car and noted that "she's also deaf." Back at the car, Johnson made hand gestures, pointed

20 to her side, and made facial expressions to indicate that she had been hit and was in pain.

21         While the officers were trying to learn more from Johnson, White burst through the front

22 doors at a sprint. According to Koskovich, White was making a loud grunting noise, had a

23 "piercing stare in her eyes," and raised her clenched right fist in the air as she ran directly at

24 them. Upon seeing White, Johnson cowered behind the officers. Koskovich yelled "stop" and

claims that he also motioned with his right hand to stop, but she ignored his commands.  Fearing that White was going to assault Johnson, Young, or himself, he drew his taser and shot.

During the subsequent investigation, the officers attempted to communicate with both White and Johnson by providing them with pen and paper.  Whether it was because White refused to cooperate, or because passing notes was not an adequate communication method, the officers were unable to learn anything from either party.  So, they recruited Officer Krancich to try to communicate with the parties.  Krancich is not a qualified interpreter, but she does know some ASL.[1]  Krancich first attempted to communicate with Johnson but was only able to learn her name.  According to Krancich, it was obvious that Johnson was in pain, but she was unable to learn from Johnson who had hurt her or how she had been injured.

Krancich next tried to communicate with White.  She was able to learn that White had been in Seattle earlier in the day and that there had been an argument in her apartment that night, but she was unable to learn anything useful as to how or why the fight started.  White attempted to use a combination of writing and signing to communicate, but Krancich was unable to follow.  When asked at her deposition whether she had learned enough on the scene to form her own opinion of whether there was probable cause, Krancich admitted that she did not.  She later clarified that she did not know what additional information Koskovich and Young had developed before and after she had arrived and that it was not her role in the investigation to evaluate or develop probable cause.

Although it is not clear exactly what else the officers learned during their investigation, it is clear that they were never able to ascertain who started the fight in White's apartment.  It is

---

[1] According to Krancich, she knows "minimal" ASL.

also clear they learned that White had called 911 from her home and that she had exited the building to talk to the officers before they decided to charge her.

Koskovich, Young, and Sergeant Lim ultimately decided to charge White with Assault and Obstruction of Justice. Their decision to charge White was apparently based on Koskovich and Young's initial assessment that White was assaultive as she exited the building and was, therefore, more likely the aggressor in her apartment. According to a City policy that requires a suspect to be booked into jail whenever physical force is used to make an arrest, White was placed under arrest and taken to the Pierce County Jail.

**C.     White's Incarceration at the Pierce County Jail**

When White arrived at the Pierce County Jail, the booking officer, who is not a party to this lawsuit, noted that White was deaf and that an ASL interpreter would be needed for court proceedings. The booking officer informed White how much her bail was in writing and completed the intake process without the assistance of an ASL interpreter.

As part of the intake process, Nurse Shelly Hull screened White to assess her injuries and identify White's medical needs. Nurse Hull is not a party to this lawsuit. Hull ordinarily completes the screening by using a pre-printed from and asking appropriate follow-up questions, including a question at the end of the screening whether there are any medical problems that had not been discussed. It is through that question that the jail would normally learn about an inmate's condition that requires a special diet or need for incontinence pads, like White's bowel condition. But, because White did not have an interpreter, or even pen and paper, Hull never asked the open-ended question after completing the form, and White did not otherwise inform the jail staff of her condition.

The next morning, Nurse Jackson was assigned to treat and evaluate White's medical needs. Jackson treated White's superficial wounds without an ASL interpreter and without

giving White pen and paper to communicate.  Jackson did not attempt to discover if White

needed additional care other than asking if she was okay.

Jackson also treated White the following morning.  This time, when Jackson asked White

if she was okay, White gestured to her hand and tried to say "hand."  Jackson looked at White's

hand and noticed that it was swollen.  She made an appointment for White to see a doctor the

next morning, but she did not give White any pain medication.  Before White had her

appointment with the doctor, however, the City decided to dismiss the charges and released her.

**D.** **White's Claims**

1. <u>Claims Against the City and the Police Officers</u>

White has asserted the following claims against the City and its employees:  (1) § 1983

claims against Koskovich for excessive force and wrongful arrest; (2) § 1983 claims against

Young for wrongful arrest and malicious prosecution; (3) § 1983 municipal liability claims

against the City for wrongful arrest; (4) ADA and Rehabilitation Act claims against the City

because she was not provided with an ASL interpreter during the investigation; (5) claims under

the Washington Law Against Discrimination (WLAD) against the City, Koskovich, and Young

because she was not provided with an ASL interpreter during the investigation; (6) state-law tort

of Outrage claims against the City and all of the named police officer defendants; and (7) state-

law claims under RCW 2.42.120for not providing her with an interpreter.

2. <u>Claims Against the County and Nurse Jackson</u>

White has asserted the following claims against the County and Nurse Jackson:  (1) a §

1983 claim against Nurse Jackson for deliberate indifference to her medical needs; (2) a § 1983

municipal liability claim against the County for deficient medical treatment; (3) ADA and

Rehabilitation Act claims against the City because she was denied specific services during her

incarceration; (4) claims under the WLAD against the City, Koskovich, and Young because she

was not provided with an ASL interpreter during her incarceration; (5) state-law claims tort of Outrage claims against the County and Nurse Jackson; (6) state-law medical malpractice claims against the County and Nurse Jackson; and (7) claims for injunctive relief against the County under both federal and state law.

## II.     DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

### B.     Claims Aginst The City And Its Police Officers

#### 1.     § 1983 Excessive Force Claim

White claims Koskovich used excessive force in violation of her Fourth Amendment rights when he tased her.  Koskovich maintains that his use of force was reasonable, and even if it was not, that he is entitled to qualified immunity as a matter of law.

The reasonableness of force used to apprehend a suspect is determined by "carefully balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Deorle v. Rutherford,* 272 F.3d 1272, 1279 (9th Cir.2001) (citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865). The reasonableness of force used must be considered "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The inquiry is objective: a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Scott v. Harris,* 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Graham,* 490 U.S. at 397, 109 S.Ct. at 1865). The question is "highly fact-specific," but courts are cautioned to make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

### a.    The Nature and Quality of the Intrusion

The "quantum of force used to arrest" is evaluated by considering "the type and amount of force inflicted." *Deorle*, 272 F.3d at 1279. The force that Koskovich used against White he inflicted with a taser in dart mode. A taser in dart mode inflicts intense pain felt throughout the body and is "administered by effectively commandeering the victim's muscles and nerves." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). The use of a taser in dart mode "constitute[s] an intermediate, significant level of force that must be justified by the governmental interest involved." *Id.* at 826. It is against this intrusion that the governmental interests must be evaluated.

### b.    Governmental Interests at Stake

The governmental interests at stake are assessed by considering the totality of the circumstances, including "the severity of the crime at issue, whether the suspect posed an

immediate threat to the safety of the officers or others, whether he was actively resisting arrest or attempting to evade arrest by flight," or any other "exigent circumstances." *Deorle*, 272 F.3d at 1280.

The first and third *Graham* factors—the severity of the crime at issue and whether the suspect was actively resisting arrest or attempting to evade arrest by flight—do not support Koskovich's use of force. The crime at issue was simple assault, a minor crime. Additionally, the officers had only just made contact with Johnson and had no evidence that White had committed a crime. Moreover, White clearly was not attempting to evade arrest; she was running *towards* the officers. Although White's failure to respond to Koskovich's commands to stop could be viewed as resisting arrest, those circumstances are more appropriately considered under the second *Graham* factor—whether White posed an immediate safety threat to the officers or others.

The second *Graham* factor— whether the suspect posed an immediate threat to the safety of the officers or others—is the most important of the three specified considerations. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). Koskovich argues that his use of force was reasonable because he perceived White's behavior as assaultive and believed that she posed a risk to Johnson's, Young's, and his own safety. Because the reasonableness of Koskovich's actions must be judged only on the circumstances known to him at the time, he argues that only his perceptions and interpretations of the circumstances are determinative. While his actions must be evaluated based on the information available to him, the Court (and a jury) do not have to accept Koskovich's version of events and explanations as truth. Indeed, when considering whether there was an immediate threat, a "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a

concern." *Id.*, at 441-42 (quoting *Deorle*, 272 F.3d at 1281).  Whether Koskovich reasonably concluded that White's behavior was assaultive is a question of fact for a jury.  To answer that question, a jury must consider *all* of surrounding circumstances that Koskovich was aware of when he elected to deploy his taser, not just the circumstances that he finds important or exculpatory.  When the facts are viewed in the light most favorable to White, a jury may conclude that a reasonable officer would not have perceived White's behavior as assaultive.

Even if the jury finds that Koskovich reasonably believed that White was the assaulter, a reasonable jury could nevertheless find that the amount of force that he used was excessive. According to the police reports, White weighed 130 pounds and was 42 years old.  Before deploying his taser, Koskovich saw White's hands and knew that she was unarmed.  In light of the other two *Graham* factors, a jury may find that an unarmed, 130 pound, 42 year-old woman running towards two police officers posed only a minor risk not significant enough to warrant the use of an intermediate level of force.  Whether Johnson posed an immediate threat that justified that quantum of force used is a question of fact for a jury.

<em>c.　Qualified Immunity</em>

Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). An officer is entitled to qualified immunity unless:  (1) the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Since *Bryan*, it has been clearly established in the Ninth Circuit that the use of a taser in dart mode constitutes an intermediate, significant level of force.  Thus, the only question that

remains is whether the law was sufficiently clearly established at the time such that a reasonable officer would have been on notice that the use of non-trivial, significant force was unreasonable under the circumstances. While this inquiry must be based on the specific facts of the case, "officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

As noted above, when the facts are viewed in the light most favorable to White, a reasonable jury may conclude that she did not pose an immediate threat to the officers' safety. At the time of the incident, it was clearly established in the Ninth Circuit that only minor physical resistance that was not particularly bellicose did not support the use of significant force when the crime at issue was minor and the suspect was not attempting to flee. *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc); *see also Deorle*, 272 F.3d 1272 (2001) (holding that it was unreasonable for officer to shoot an individual with a bean bag who was suspected of no crime, only passively resisted officers, and posed a minimal risk of harm); *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) (holding that the use of pepper spray and failing to alleviate its effects was unreasonable when individuals were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others); *Bryan*, 630 F.3d 805 (2010) (holding use of taser in dart mode was unreasonable when the individual was suspected of only minor criminal activity, offered merely passive resistance, and posed little or no threat of harm to others).

Koskovich is not entitled to qualified immunity, and his motion for summary judgment is **DENIED.**

2.   § 1983 Wrongful Arrest Claim

White next alleges a § 1983 claim for wrongful arrest. An arrest is lawful in the Fourth Amendment context only if the arresting officer had probable cause to believe that the arrestee

had committed, or was committing, an offense. *Torres v. City of Los Angeles,* 548 F.3d 1197, 1207 n. 7 (9th Cir. 2008). Probable cause exists when a prudent person would have concluded, based on the totality of circumstances known to the officers at the time, that there was a fair probability that the defendant had committed a crime. *Grant v. City of Long Beach,* 315 F.3d 1081, 1085 (9th Cir.2002).

When police are determining whether they can place a suspect under arrest, they cannot disregard facts that they learn on the scene that tend to dissipate probable cause. *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005). Even if officers initially have probable cause to justify an arrest, it is illegal to execute or continue an arrest when additional information is obtained at the scene that indicates that there is less than a fair probability that the defendant had committed a crime. *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007).

Material questions of fact preclude the Court from finding as a matter of law that the officers had probable cause after the investigation to believe that White had assaulted Johnson and committed Obstruction of Justice. According to the officers, they concluded that White was the primary aggressor in her apartment primarily because of her demeanor as she exited the apartment. A reasonable jury could conclude that the officers learned information after tasing White that explained her behavior and dissipated their basis for probable cause. A jury may also conclude that upon learning that White had called 911 for assistance and that she had gone outside to assist the police, as they had requested, the police no longer had reason to believe that there was a fair probability that White willfully hindered, delayed, or obstructed the officers from discharging their duties.

The officers contend that the municipal court's judicial determination of probable cause following White's arrest establishes as a matter of law that they had probable cause. Officer

1   Young's affidavit of probable cause, which formed the basis for the judicial determination,

2   merely recites the officers' version of events leading up White's tasing and then states, "[a]fter

3   further investigation both parties stated they were assaulted by the other. [White] was

4   determined to be the primary aggressor and was placed under arrest." Absent from the statement

5   of probable cause is any explanation of how or why the officers determined that White was the

6   primary aggressor. Also notably absent from the statement of probable cause are facts that the

7   officers learned on the scene that tend to dissipate probable cause. Because the municipal court's

8   probable cause determination was based on only part of the information known to the officers, a

9   jury is not precluded from finding that the officers did not have probable cause.

10          Koskovich and Young's motion for summary judgment on White's § 1983 Wrongful

11  Arrest claim is **DENIED**.

12                  3.      Malicious Prosecution Claims

13          White has alleged both state and constitutional malicious prosecution claims against

14  Young because he filed the affidavit of probable cause for her arrest. Under Washington law, a

15  plaintiff must prove the following elements to establish a claim for malicious prosecution: (1)

16  the defendant instituted or continued the allegedly malicious prosecution; (2) there was not

17  probable cause to institute or continue the prosecution; (3) the defendant acted with malice; (4)

18  the proceedings terminated on the merits in the plaintiff's favor; and (5) the plaintiff suffered

19  injury or damage as a result of the prosecution. *Bender v. City of Seattle*, 99 Wn.2d 582, 593,

20  664 P.2d 492, 500 (1983). To establish a § 1983 claim for malicious prosecution, a plaintiff

21  must additionally prove that the defendant instituted the prosecution for the purpose of denying

22  the plaintiff equal protection of the laws or another specific constitutional right. *Lacey v.*

23  *Maricopa County*, 649 F.3d 1118, 1133 (9th Cir. 2011).

24

1     In his defense, Young first argues that he had probable cause to arrest White. As noted

2  above, material questions of fact preclude a determination of probable cause as a matter of law.

3  Young additionally contends that White has failed to present any evidence that the he acted with

4  malice. In a malicious prosecution context, the term "malice" has a more general meaning than

5  it does in ordinary parlance. *Bender*, 99 Wash.2d at 594. A plaintiff can prove malice by

6  showing that the prosecution was commenced for improper or wrongful motives or in reckless

7  disregard of the plaintiff's rights. *Id.* In some circumstances, malice may be inferred from lack

8  of probable cause. *Id.*

9     If the jury finds that the officers did not have probable cause to charge White, the jury

10  could also reasonably infer that Officer Young commenced the prosecution for an improper

11  purpose, such as to make Koskovich's use of force appear more reasonable. The evidence

12  available to the officers at the time was that both parties claimed that they were assaulted by the

13  other. Koskovich testified at his deposition that, not only were the officers unable to determine

14  who started the fight in White's apartment, they were unable to even get a statement from either

15  of the parties about who started the fight. Although the officers claim that White's behavior as

16  she exited the apartment seemed aggressive at the time, they learned information during the

17  investigation that tends to show that they misinterpreted her actions. Despite the ambivalence of

18  the evidence, the officers seem to have focused in hindsight on the party that Koskovich tased.

19     Officer Young may very well be able to legitimately explain why White was charged.

20  But, the credibility of witnesses and weight to be assigned to the evidence are matters for a jury.

21  When the evidence is viewed in the light most favorable to White, a jury may conclude that the

22  prosecution was commenced for an improper purpose. Young's motion for summary judgment

23  on White's malicious prosecution claims is **DENIED**.

24

4.    §1983 Municipal Liability Claims

A municipality cannot be held liable under § 1983 for its employees' actions on a theory of respondeat superior. *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). For a municipality to be liable under § 1983, a plaintiff must prove that: (1) a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (2) the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an action of official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir.1992).

Additionally, a municipality may be held liable for its failure to act only when its deliberate indifference led to an omission that caused an employee to commit the constitutional violation. *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). "To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." *Farmer*, 511 U.S. at 841.

White claims the City's written policy of prohibiting a suspect from being cited and released in lieu of being booked into jail when force was used caused her to be wrongfully arrested. She also has alleged that the City has failed to train its police officers when and how to obtain ASL interpreter services and that the City has a longstanding practice or custom of not providing deaf victims, suspects, and witnesses with an ASL interpreter during an investigation.

*a.*    *Written Policy Requiring Suspect Be Booked Into Jail When Force Used*

White's first *Monell* claim is based on the City's written policy that prohibits officers from citing and releasing subjects in lieu of booking them into the County Jail "[w]henever physical force is employed in effecting an arrest and/or the subject attempted to physically evade arrest . . . ." White claims that she would not have been incarcerated but for the policy to book subjects when force is used.

The policy that White complains of does not permit, let alone require, officers to arrest subjects without probable cause. In fact, the very first line of the policy provides that "[all] arrests require a written report documenting the probable cause for the arrest and the circumstances surrounding the arrest." All that the policy requires is that the subject be booked into jail instead of being released *if* the officers have probable cause *and* the officers used physical force to effect the arrest. Because the policy does not permit a suspect to be arrested without probable cause, it could not have caused her to have been unlawfully arrested. The City's motion for summary judgment on this claim is **GRANTED**.

*b.*    *Failure to Enact a Policy Related to Sign-Language Interpreter Use and Failure to Train Officers When to Request Sign-Language Interpreter*

White also claims that the City is liable under § 1983 for her wrongful arrest because it (1) failed to train its police officers when and how to obtain interpreter services when dealing with a deaf individual, and (2) has a longstanding practice of denying deaf victims, suspects, and witnesses an ASL interpreter during an investigation.

Whether the City has a custom of denying deaf suspects, victims, and witnesses an ASL interpreter is a question of fact for the jury. It is also a question of fact for the jury whether the City's failure to train its officers when an ASL interpreter is needed during an investigation or its

alleged custom of not using ASL interpreters caused White to be arrested without probable

cause. Lastly, it is a question of fact whether the City was on notice that a constitutional

violation would likely result due to its omissions. When the evidence is viewed in the light most

favorable to White, a reasonable jury could conclude that the City's omissions caused White to

be arrested without probable cause. The City's motion for summary judgment on this § 1983

municipal liability claim is **DENIED**.

### 5. ADA, Rehabilitation Act, and WLAD Claims

White has also alleged claims against the City and its employees under Title II of the

ADA, § 504 of the Rehabilitation Act, and the WLAD because she was not provided an

interpreter during the investigation. These three statutes have similar elements and are

considered together.

#### a. *ADA and Rehabilitation Act Claims*

Title II of the ADA provides that, "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132.

Citing *Patrice v. Murphy*, 43 F.Supp.2d 1156 (W.D. Wash. 1999), the City argues that

the ADA does not apply to a police officer's arrest of a citizen. The facts in *Patrice* are very

similar to the facts in this case, and the issue considered was precisely the issue now before this

Court. In *Patrice*, a deaf woman called 911 to report that her husband, who was also deaf, had

assaulted her. The police conducted an investigation without an ASL interpreter (although the

couple's daughter acted as an interpreter) and decided to charge the woman who called 911, not

her husband. In holding that the police were not required to provide the plaintiff with an ASL

investigator during the on-the-scene investigation, Judge Lasnik concluded that "an arrest is not

the type of service, program, or activity from which a disabled person could be excluded or denied the benefits, although an ADA claim may exist where the claimant asserts that he has been arrested because of his disability." *Id.* at 1162. Judge Lasnik noted the policy rationale supporting his conclusion,

> Where underlying criminal activity has occurred, such as a bank robbery, drunken driving, or domestic violence, and the officers are engaged in an on-the-street response, investigation, and arrest, forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene.

*Id.*

White contends that Judge Lasnik's analysis in *Patrice* is no longer persuasive after the Ninth Circuit's holding in *Thompson v. Davis*, 295 F.3d 890 (9th Cir. 2002). In *Thompson*, the court of appeals noted that "the weight of authority on the applicability of the ADA to arrests suggests that a state's substantive decision-making processes in the criminal law context are not immune from the anti-discrimination guarantees of federal statutory laws." *Id.* at 897. The *Thompson* court further noted that law enforcement agencies are obligated to modify any "policies that result in discriminatory arrests or abuse of individuals with disabilities" under the ADA. *Id.*

*Thompson* is not directly on-point and is easily distinguishable from the case at-hand. In *Thompson*, the Ninth Circuit considered whether the ADA applies to parole-board hearings. White has cited no authority that the "substantive decision-making processes" that the *Thompson* court concluded are not immune from ADA protections include on-the-scene police investigations.

Given the similarity of the facts and issue presented in *Patrice* and Judge Lasnik's sound reasoning, the Court concludes that the ADA does not apply to on-the-scene investigations unless the claimant asserts that he or she was arrested *because* of his or her disability.

That does not mean that the police's failure to provide White, or Johnson for that matter, with an ASL interpreter or other effective means of communication is not relevant to White's other claims. Indeed, the officers' inability to communicate with White and Johnson is extremely relevant to White's wrongful arrest and municipal liability claims. But, because the ADA did not compel the City to provide White with an interpreter during the investigation, Defendants' motion for summary judgment on White's ADA and Rehabilitation Act claims is **GRANTED**.

### b.    *WLAD Claim*

Like the ADA, the WLAD prohibits discrimination based on discrimination in the public sphere. To establish a claim under the WLAD, a plaintiff must prove that:

> (1) the plaintiff is disabled; (2) the defendant's establishment is a place of public accommodation; (3) disabled persons are not provided services comparable to those provided nondisabled persons by or at the place of public accommodation; and (4) the disability was a substantial factor causing the discrimination.

*Fell v. Spokane Transit Auth.,* 128 Wash.2d 618, 637, 911 P.2d 1319 (Wash.1996) (en banc).

The City again cites to *Patrice* and argues that the WLAD does not apply because the activities occurred at White's private residence, not a place of public accommodation. White contends that the City's reliance on *Patrice* is misplaced because the activities here occurred on a public sidewalk and in the lobby of a state-owned apartment building.

White has failed, however, to submit any evidence that White's apartment building is state-owned. White has also failed to point to any authority to show that it is material that the investigation occurred on the sidewalk in front of a private residence and not directly on private

property.  As Judge Lasnik noted in *Patrice*, "[t]he use of the word 'public' was clearly meant to outlaw discrimination by those who make money serving the masses."  *Patrice*, 43 F.Supp.2d at 1162.  Because White's apartment building, and the sidewalk in front of her building, cannot be considered a place of public accommodation, Defendants' motion for summary judgment on White's WLAD claim is **GRANTED**.

### 6.    RCW 2.42.120 Claims

White has also stated claims under RCW 2.42.120 against the City and police officers because she was not provided an interpreter during the investigation.  Subsection (4) of RCW 2.42.120 require law enforcement agencies to provide hearing impaired victims, witnesses, and suspects with a qualified interpreter throughout the investigation.  The Ninth Circuit has held that RCW 2.42.120 creates a private cause of action for damages.  *Duffy v. Riveland*, 98 F.3d 447 (9th Cir. 1996).  In 1998, however, the Washington Supreme Court declared subsections (4) and (5)[2] unconstitutional because the title of the bill that enacted the statute did not comply with article II, section 19 of the Washington Constitution.

In 2008, the Washington legislature amended RCW 2.42.120.  To comply with article II, section 37 of the Washington Constitution, which requires that a proposed amendment recite the section to be amended at full length, the 2008 bill recited the full text of RCW 2.42.120, including subsections (4) and (5), as well as the text to be added as a new subsection (7) at the end of the existing statute.

White contends that, in addition to adding a new subsection, the 2008 amendment also reenacted the previously invalidated subsections (4) and (5).  She argues that those subsections

---

[2] Subsection (5) requires that hearing impaired individuals who have been arrested be provided with a qualified interpreter for any notification of rights, warning, interrogation, or taking of a statement.

were only declared unconstitutional for procedural defects and that the 2008 amendments cured those defects. She concludes that subsections (4) and (5) have been enforceable since 2008 and that the City was required to provide her with an ASL interpreter during the investigation. The City does not contend that it complied with subsection (4). Thus, the effect of the 2008 amendments is dispositive of White's claims under the statute.

Nothing in the legislative history of the 2008 amendment suggests that the legislature intended to reenact the previously invalidated subsections. Nothing in the legislature suggests that the legislature even contemplated that result. Every indication is that subsections (4) and (5) were included in the text of the bill simply to comply with Article II, § 37 of the Washington Constitution. To nevertheless conclude that the amendments reenacted the previously invalidated subsections would go against the very purpose both § 19 and § 37 of Article II; to ensure that the effect of proposed legislation and the impact on existing laws are disclosed before the legislation is adopted. *See Washington v. Tessema*, 139 Wash.App. 483 (2007); *Locke v. City of Seattle*, 133 Wash.App. 696 (2006). Accordingly, the Court concludes that the 2008 legislative amendments to RCW 2.42.120 did not reenact subsections (4) and (5).

To be clear, the Court is not declaring subsections (4) and (5) unconstitutional; the Washington Supreme Court has already done that. Rather, the Court is merely concluding that the 2008 legislative amendments did not have the unintended effect of reenacting those previously invalidated subsections. The Defendants' motion for summary judgment on White's RCW 2.42.120 claims is **GRANTED**.

### 7.    Tort of Outrage Claims

White has asserted claims for the tort of Outrage against the City, Koskovich, Young, Krancich, and Lim. The basic elements of the tort of outrage are: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the

plaintiff of severe emotional distress." *Rice v. Janovich,* 109 Wash.2d 48, 61, 742 P.2d 1230 (1987). The conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby v. Samson*, 85 Wash.2d 52, 59, 530 P.2d 291 (1975). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. *Phillips v. Hardwick,* 29 Wash.App. 382, 387, 628 P.2d 506 (1981).

Again, when the facts are viewed in the light most favorable to White, Officers Young and Koskovich responded to White's call to 911 for assistance and, instead of helping her, they tased her. Then, in an attempt to cover up their own mistake, they charged her with assault and booked her into jail where she was held for over two days. On these facts, a reasonable jury could conclude that Koskovich and Young's conduct was sufficiently outrageous and that they recklessly caused White emotional distress.

White has failed, however, to point to any of Sergeant Lim's or Officer Krancich's conduct that a reasonable jury could conclude was outrageous. The Defendants' motion for summary judgment regarding White's claim for the Tort of Outrage is **GRANTED** with respect to Defendants Lim and Krancich but **DENIED** with respect to Koskovich, Young, and the City.

### C. Claims Against The County And Nurse Jackson

#### 1. ADA, Rehabilitation Act, and WLAD Claims

White claims that the County violated the ADA, Rehabilitation Act, and WLAD by (1) failing to communicate her bail amount to her; (2) failing to ensure that she could adequately communicate during her medical appointments; and (3) failing to provide her with an operable TTY telephone.

To establish a claim under Title II of the ADA, a plaintiff must show that he or she (1) is a "qualified individual with a disability"; (2) was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) was excluded, denied benefits, or discriminated against was by reason of his disability. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (citing *Weinreich v. Los Angeles County Metropolitan Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.1997)). A plaintiff bringing suit under § 504 of the Rehabilitation Act must additionally prove that the program receives federal financial assistance. *Id.*

Under the ADA, a public entity's failure to provide a disabled individual with a reasonable accommodation may constitute discrimination. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). Specifically, with regards to individuals with disabilities that inhibit communication, a public entity must take steps to ensure that communications with a disabled person are as effective as communications with others. 28 U.S.C. § 35.160(a)(1). A fact-specific analysis of the disabled individual's circumstances is required to determine whether an accommodation is reasonable. *Vinson*, 288 F.3d at 1154.

Monetary damages are available under the ADA only upon a showing of deliberate indifference. *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008). Deliberate indifference requires a showing of both "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1139.

The County argues first that White has not established that she was denied access to any program, service, or activity during her incarceration. Although incarceration itself is not a "program" or "activity" under the ADA, any service or program provided at jails and prisons is within the meaning of the ADA. *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001).

White has alleged that the County denied her access to an operable telephone suitable to accommodate her needs and that the County's failure to ensure that she could adequately communicate effectively denied her the right to medical care and the right to be informed of the amount of her bail. Despite the County's assertion, access to medical care, access to telephones, and being informed about the amount of bail imposed are services provided by the jail within the ambit of the ADA.

The County alternatively argues that it is entitled to summary judgment on White's discrimination claims because White never requested an ASL interpreter and because it provided White with reasonable accommodations. To support its position, the County cites to a number of cases where writing was found to be an effective accommodation for deaf individuals.

Whether or not the County adequately accommodated White's disability is a question of fact for a jury. The sufficiency of an accommodation required "will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). From the evidence, a reasonable jury could conclude White's disability was obvious and that written communication was not adequate to ensure that she could communicate as effectively as others. A reasonable jury could also conclude from the evidence that written communication was sufficient. Accordingly, neither White nor the County is entitled to judgment as a matter of law on White's discrimination claims and both of their motions for summary judgment are **DENIED**.

2.    § 1983 Deliberate Indifference to Medical Needs Claim

White has alleged that Nurse Jackson was deliberately indifferent to her medical needs while she was incarcerated in violation of her Eighth Amendment rights. To establish a an Eighth Amendment § 1983 claim based on deficient prison medical treatment, a plaintiff must

establish (1) that he or she had a serious medical need, and (2) that the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

To prove that the defendant's response was deliberately indifferent, a plaintiff must establish: (1) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (2) harm caused by the indifference. *Id.* "Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Id.* (quoting *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988)). A defendant's inadvertent or negligent failure to provide adequate medical care, by itself, does not establish indifference. *Id.*

White does not contend that Jackson knew about her bowel condition. Rather, White argues that a jury could conclude that Jackson was willfully ignorant of her condition because she did not make an effort to substantively communicate with Johnson through an interpreter. White's argument may have merit if her condition was obvious or plainly observable, but absent any evidence that Jackson knew about White's bowel condition, no reasonable jury could conclude that she was *deliberately* indifferent to White's medical needs. White's § 1983 deliberate indifference claim against Jackson fails because she has no evidence that Jackson denied, delayed, or interfered with White's medical care. Jackson's motion for summary judgment on White's § 1983 claim is **GRANTED**.

> 3. § 1983 Municipal Liability Claim

White has alleged that the County's policies and customs that prevented the use of ASL interpreters caused Jackson to violate her Eight Amendment rights. As just discussed, even when the facts are viewed in the light most favorable to White, no reasonable jury could conclude that Jackson violated White's Eighth Amendment rights. Because there is no underlying constitutional violation, the County is also entitled to judgment as a matter of law on

White's § 1983 municipal liability claim.  The County's motion for summary judgment on White's municipal liability claim is **GRANTED**.

### 4.    Medical Malpractice Claims

White has alleged that the County and Nurse Jackson committed medical malpractice by failing to fully assess her medical needs and history.  The Washington medical malpractice statute requires the same elements of proof as traditional negligence: duty, breach, proximate cause, and damages.  *Mohr v. Grantham*, 172 Wash.2d 844 (2011) (citing RCW 7.70.040).

White's medical malpractice claims fail because she has not submitted any evidence that the County and Jackson's failure to fully assess her medical history caused a compensable injury. White argues that the jail would have discovered that she needed a special diet and medical supplies to deal with her bowel condition if Jackson had utilized an interpreter.  Although White's claimed injuries may be compensable under the ADA, they will not support a claim for medical malpractice.  White does not claim that she needed to be treated for her bowel condition; she merely claims that the jail would have learned that she needed supplies during her incarceration to deal with her condition.  Because White has failed to establish all of the elements of her medical malpractice claim, the County and Jackson are entitled to judgment as a matter of law.  Defendants' motion for summary judgment on White's medical malpractice claim is **GRANTED**.

### 5.    Tort of Outrage Claims

To maintain a claim for the tort of Outrage under Washington law, a plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby*, 85 Wash.2d at 59.  White contends that a jury could find that Jackson and the County outrageously denied her the ability to communicate her medical needs.

Simply calling conduct "outrageous" does not make it so. Even when the evidence is viewed in the light most favorable to White, no reasonable jury could conclude that Jackson and the County's failure to provide her with an interpreter was so outrageous in character or extreme in degree so as to go beyond all possible bounds of decency. Defendants' motion for summary judgment on White's Outrage claim is **GRANTED**.

6.     <u>Injunctive Relief</u>

White seeks an injunction against the County under both federal and Washington law "to correct the policies and practices of the Defendants that violate applicable Federal and Washington State statutes." To have standing for injunctive relief, a plaintiff must show that he or she is under the threat of suffering an "injury in fact" that is (1) concrete and particularized; (2) "actual and imminent, not conjectural or hypothetical"; and (3) fairly traceable to the challenged action of the defendant. *Summers v. Earth Island Institute*, 55 U.S. 488, 493, 129 S. Ct. 1142, 1149 (2009). The plaintiff must also show that a favorable judicial decision will likely prevent or redress the impending injury. *Id.*

White does not have standing to obtain an injunction against the County because she is no longer an inmate at the Pierce County Jail and has not shown that she is at risk of any future harm. Any assertion that she may be an inmate in the future is purely conjectural and hypothetical. Because White does not have standing, the Defendants' motion for summary judgment on White's claim for an injunction is **GRANTED**.

**III. CONCLUSION**

White's motions for partial summary judgment are **DENIED**. Defendants' motions for summary judgment on White's claims are **GRANTED IN PART AND DENIED IN PART** as follows:

- § 1983 excessive force claim against Koskovich—**DENIED;**

- § 1983 wrongful arrest claim against Koskovich and Young—**DENIED;**
- § 1983 and state law malicious prosecution claims against Young—**DENIED**;
- § 1983 *Monell* claim against the City based on written policy—**GRANTED**;
- § 1983 *Monell* claim against the City based on failure to train and custom or practice—**DENIED**;
- ADA, Rehabilitation Act, and WLAD claims against the City—**GRANTED**;
- RCW 2.42.120 claims against the City and all of the officers—**GRANTED;**
- Tort of Outrage claims against Koskovich, Young, and the City—**DENIED**;
- Tort of Outrage claims against Lim and Krancich—**GRANTED**;
- ADA, Rehabilitation Act, and WLAD claims against the County—**DENIED**;
- § 1983 deliberate indifference to medical needs claim against Jackson—**GRANTED**;
- § 1983 *Monell* claim against the County—**GRANTED**;
- Medical malpractice claims against Jackson and the County—**GRANTED**;
- Tort of Outrage claims against Jackson and the County—**GRANTED**;
- Injunctive relief against the County—**GRANTED.**

It is so Ordered.

Dated this 15th day of January, 2014.

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE